IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| AARON MCKEE, SARAH MCKEE, | § | |
| | § | |
| *Plaintiffs,* | § | SA-22-CV-01110-XR-ESC |
| | § | |
| vs. | § | |
| | § | |
| CHUBB LLOYDS INSURANCE | § | |
| COMPANY OF TEXAS, | § | |
| | § | |
| *Defendant.* | § | |

## ORDER

Before the Court in the above-styled cause of action are Defendant Chubb Lloyds Insurance Company of Texas's Motion to Exclude Expert Testimony of Nicolette Alyfantis, Garry Pennington, Gregory Hayden, and Josh Vest [#33] and Plaintiffs' Opposed Motion to Exclude the Opinion Testimony of Mark Barsalou [#45]. The District Court referred this case to the undersigned on February 9, 2024 [#51]. The undersigned therefore has authority to enter an order on the parties' non-dispositive motions pursuant to 28 U.S.C. § 636(b)(1)(A).

The Court held a hearing on the motions on February 20, 2024, at which counsel for both parties appeared via videoconference. After considering the parties' motions, the responses and replies thereto [#42, #47, #52, #55], the arguments of counsel at the hearing, the record before the Court, and the governing law, the Court will grant Defendant's motion but deny Plaintiffs' motion.

## I. Background

This insurance dispute arises out of damage to the approximately 16,000 square foot home[1] of Plaintiffs Aaron McKee and Sarah McKee during Winter Storm Uri in February 2021.

---

[1] The parties repeatedly refer to the house as being approximately 16,000 square feet in size, but the summary judgment record indicates it is 13,470 square feet of "finished space."

Plaintiffs allege that their interior water pipes froze during the storm and burst, resulting in over $7 million in damage. Defendant Chubb Lloyds Insurance Company of Texas ("Chubb")—their insurer—has refused to compensate Plaintiffs for more than approximately $1.2 million. Although Chubb approved only limited repairs to their home, Plaintiffs proceeded with much more extensive demolition and reconstruction and claim additional repairs are needed. This case will turn on whether Plaintiffs' claimed damages represent repairs that are necessary to restore their property to its pre-loss condition.

Plaintiffs have designated several non-retained experts involved in the repairs to testify on the extent of the damage. By its motion, Chubb asks the Court to exclude the testimony of four of these experts under Rule 702 of the Federal Rules of Evidence: Nicolette Alyfantis (Plaintiffs' general contractor), Gary Pennington (the licensed public adjuster retained to assist Plaintiffs with their insurance claim), Gregory Hayden (one of the plumbing subcontractors retained by Plaintiffs), and Josh Vet (Hayden's journeyman apprentice). By their motion, Plaintiffs ask the Court to exclude the testimony of Mark Barsalou, Chubb's non-retained plumbing expert whose company evaluated the damage to Plaintiffs' home following the storm. This case is set for jury selection and trial before the District Court on April 29, 2024.

## II.  Legal Standard

In a diversity case, the admissibility of evidence is a procedural issue governed by federal law. *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court held that trial judges must ensure that any scientific testimony or evidence admitted is not only relevant, but reliable. Subsequently, Rule 702 of the Federal Rules of Evidence was amended to incorporate the requirements of *Daubert*. *See Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir.

2004) (quoting Fed. R. Evid. 702).  Last year, Rule 702 was further amended to clarify that the

proponent of the evidence bears the burden to demonstrate that an expert's testimony is both

relevant and reliable by showing that it is "more likely than not" that:

> (a) the expert's scientific, technical, or other specialized knowledge will help
> the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and
> methods to the facts of the case.

Fed. R. Evid. 702.  The Rule 702 and *Daubert* analysis applies to all proposed expert testimony,

including nonscientific "technical analysis" and other "specialized knowledge."  *Kumho Tire*

*Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

"Under Federal Rule of Evidence 702, district courts are assigned a gatekeeping role to

determine the admissibility of expert testimony."  *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th

286, 303 (5th Cir. 2024) (quoting *United States v. Valencia*, 600 F.3d 389, 423–24 (5th Cir.

2010)).  Acting as gatekeeper, "[t]he court must find that the evidence is both relevant and

reliable before it may be admitted."  *Id*. (quoting Valencia, 600 F.3d at 424).  "This requires

more than a glance at the expert's credentials; the court must also ensure that the expert has

reliably applied the methods in question."  *Id*. (quoting Valencia, 600 F.3d at 424).  "Rule 702(d)

has also been amended to emphasize that each expert opinion must stay within the bounds of

what can be concluded from a reliable application of the expert's basis and methodology."  Fed.

R. Evid. 702, Adv. Comm. Notes (2023).  "Judicial gatekeeping is essential because just as

jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the

reliability of scientific and other methods underlying expert opinion, jurors may also lack the

specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *Id.* A district court that permits an expert to testify without a proper foundation abdicates its role as gatekeeper and commits reversible error. *Harris*, 92 F.4th at 303.

The primary issue raised in the parties' motions is whether the proposed expert testimony is reliable. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592–93). The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See Daubert*, 509 U.S. at 590. Opinions that are fundamentally unsupported offer no expert assistance to the trier of fact and should be excluded. *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).

The Court may consider several nonexclusive factors in determining reliability, including: (1) whether the technique has been tested, (2) whether the technique has been subject to peer review and publication, (3) the technique's potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson v. Tex. Dep't of Crim. Just.*, 393 F.3d 577, 584 (5th Cir. 2004). Overall, the trial court must strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Adv. Comm. Notes (2000). "Vigorous cross-examination, presentation of contrary evidence, and

careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Ultimately, "[s]ome challenges to expert testimony will raise matters of weight rather than admissibility . . . ." Fed. R. Evid. 702, Adv. Comm. Notes (2023).  "For example, if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility."  *Id.*  A district court enjoys broad discretion in determining the admissibility of expert testimony, and such decisions will not be disturbed on appeal unless a ruling is "manifestly erroneous." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

### III.  Analysis

For the reasons that follow, the Court will grant Chubb's motion to exclude Plaintiffs' four challenged experts, but the Court will deny Plaintiffs' motion to exclude Chubb's plumbing expert.

### A.      Chubb's Motion to Exclude

Chubb's Rule 702 motion asks the Court to exclude the testimony of Nicolette Alyfantis, Garry Pennington, Gregory Hayden, and Josh Vet.  Plaintiffs designated Alyfantis, Plaintiffs' general contractor, as a non-retained expert responsible for overseeing the current repairs necessary to bring Plaintiffs' home to pre-loss condition.  (Expert Designation [#33-1], at 2–3.) Gary Pennington was also designated as a non-retained expert and is the licensed public adjuster Plaintiffs retained to assist them with their insurance claim.  (*Id.* at 1–2.)  Plaintiffs designated Hayden and Vet, master plumber and his apprentice, as non-retained experts responsible for the re-piping of Plaintiffs' entire plumbing system in their home.  (*Id.* at 3.)  Plaintiffs assert that these individuals intend to provide testimony supporting Plaintiffs' allegation that the reasonable

and necessary repairs caused by the storm damage amount to over $7 million with necessary plumbing repairs and electrical repairs each approximating $1.5 million due to the need for total system replacements.  The Court will address Chubb's challenge to each of these experts in turn.

      **i.**      **<u>Hayden and Vest</u>**

Plaintiffs' expert designation indicates that Hayden and Vest work for Alamo Preferred Plumbing and are designated to testify about the plumbing system repair work they performed. (*Id.* at 3.)  Additionally, the designation states that Alamo Preferred Plumbing holds the opinion that an estimate prepared by Alyfantis for the re-piping of Plaintiffs' home at approximately $1.5 million constitutes the reasonable and necessary cost to repair the plumbing system.  (*Id.*) Chubb's motion argues that Plaintiffs have not demonstrated that any testimony of Hayden and Vest on the necessity of replacing the entire plumbing system is reliable.  The Court agrees with Chubb.

The record contains the deposition testimony of Hayden, in which he distanced himself from the determination that Plaintiffs' plumbing system must be replaced.  Hayden testified that he was instructed by Plaintiffs and Alyfantis to re-pipe the entire home, was unaware who "made that call," and did not make his own independent analysis of the extent of damage and the scope of necessary repairs, as he "was not able to do an investigation."  (Hayden Decl. [#33-6], at 57:6–59:2, 94:22–95:12, 160:3–15.)  Furthermore, Hayden stated in his deposition that he believed Alyfantis's $1.5 million estimate on the plumbing repairs was "excessive" for the re-piping of the entire home.  (*Id.* at 57:6–59:2.)

In their response to Chubb's motion, Plaintiffs agree to limiting the testimony of Hayden and Vest to the work they already performed on Plaintiffs' home, which was not a complete re-piping of the system.  The Court will therefore grant this portion of Chubb's motion as

unopposed.  In doing so, the Court notes that, in light of Hayden's deposition testimony, it is unlikely that Hayden (or Vest) would testify at trial that the plumbing system needs to be replaced.  Plaintiffs have not carried their burden to establish that Hayden and Vest could offer any reliable testimony on the need to replace Plaintiffs' entire plumbing system.  Accordingly, Hayden and Vest may only testify at trial as fact witnesses on the plumbing work they actually performed.

> **ii.**     **<u>Alyfantis</u>**

Plaintiffs' expert designation of Alyfantis states that she is the sole owner of Iesos, LLC, which is the general contractor Plaintiffs hired to inspect, oversee, and make the reasonable and necessary repairs to restore Plaintiffs' home to its pre-loss condition.  (Expert Designation [#33-1], at 2.)  Alyfantis prepared her own estimate of Plaintiffs' damages and intends to testify that the reasonable and necessary cost to repair and restore the damage from the storm is $6,209,866.84.  (*Id.*)  This proposed testimony is summarized in the general service agreement between Iesos and Plaintiffs, as well as Alyfantis's deposition and declaration.  (Iesos Estimate [#33-2]; Alyfantis Dep. [#33-4]; Alyfantis Decl. [#42-1].)

Chubb argues that Alyfantis is not qualified to opine that the entire plumbing and electrical systems require replacement because she is not an electrician or a plumber.  As to the electrical repairs, Chubb also argues Alyfantis's opinions are unreliable, as there is no other expert designated to testify on Plaintiffs' electrical-related repairs and her opinions are based on a mere visual inspection of the property, not testing.  As to the plumbing repairs, Chubb argues Alyfantis's opinions are not reliable because she testified that her opinions are based on Plaintiffs' and her own assessment of the need for total replacement, not the opinions of licensed plumbers or identified tests of the system.  Generally, Chubb acknowledges that Alyfantis is a

key fact witness who may testify on her work collecting bids for repairs, working with subcontractors, the scope of the bids solicited, and the work performed.  But Chubb believes Plaintiffs have not satisfied their burden to establish Alyfantis's qualifications to testify that full replacement of the plumbing and electrical system is required to restore the property to its pre-loss condition and that any opinions to that effect are based on sufficient facts or data or principles and methods to be reliable under Rule 702.  The Court agrees with Chubb.

Plaintiffs argue that Alyfantis is qualified to testify on the engineering damage because she has spent over 150 weeks on the property, personally observed fried breakers and wires and burned motherboards and electrical bridges, has assisted her father (who is a master electrician) with troubleshooting electrical equipment, and had conversations with electricians who agreed system replacement is required.  (Alyfantis Decl. [#42-1], at ¶¶ 2–10.)  Plaintiffs also point out that Alyfantis is a certified "Lutron" technician capable of evaluating, diagnosing, and performing repairs to Lutron electrical equipment.  (*Id.* at ¶ 4.)  These facts do not establish by the preponderance of the evidence that Alyfantis is qualified to testify that Plaintiff's 16,000 square-foot-home's entire electrical system must be replaced.  Alyfantis is not a licensed electrician.  Plaintiffs have not identified any specific training Alyfantis has received in diagnosing damage to entire electrical systems; nor do Plaintiffs proffer that their entire electrical system is a Lutron system or adequately explain how the technical aspects of Alyfantis's Lutron certification qualifies her to evaluate the entire scope of damage to Plaintiffs' enormous residential property.

Also, the Court agrees with Chubb that Plaintiffs cannot use Alyfantis to testify as to the purported opinions of other non-designated electricians on the scope of necessary electrical repairs.  Alyfantis's declaration states that in reaching her opinions she relied on "representations

made by all of the plumbers and electricians who inspected the home," including Lamb EJB Construction & Electric and Dominion Electric.  (*Id.* at ¶¶ 7, 10.)  The summary judgment record contains a quote by Lamb EJB for replacement of the electrical system for approximately $1.5 million.  (Lamb EJB Estimate [#35-6].)  Yet Plaintiffs have not designated any electricians, Lamb EJB or others, to render opinions on the extent of the electrical system damage or the necessity of total system replacement.  To establish the reliability of Alyfantis's opinion on the electrical system, Plaintiffs must prove by the preponderance of the evidence that she has "independently evaluated or verified the opinions upon which [she] relies."  *Robison v. Cont'l Cas. Co.*, No. 1:17-CV-508, 2022 WL 336900, at *9 (E.D. Tex. Jan. 6, 2022) (internal quotation and citation omitted).  Plaintiffs have not done so.

Plaintiffs attempt to argue that Alyfantis conducted her own independent investigation to reach her own independent conclusions, but Plaintiffs have not demonstrated that this investigation was performed based on reliable methods.  Alyfantis's declaration states that she personally observed electricians perform low-voltage testing and visible damage to specific components of the electrical system, such as motherboards, breakers, and wires.  (Alyfantis Decl. [#42-1], at ¶ 8.)  Alyfantis testified in her deposition that her opinion was also based on a personal observation of the lights throughout Plaintiffs' home not turning on.  (Alyfantis Dep. [#33-4], at 102:17–102:20.)  However, Alyfantis does not identity in her declaration or deposition the tests performed by Lamb EJB or other electricians and how these tests support the conclusion that the electrical system requires replacement.  Nor do Plaintiffs explain to the Court how Alyfantis's visual inspection of damage and lack of power in the home translates to the need for entire system replacement of Plaintiffs' 16,000 square foot home at the cost of $1.5 million.

The same conclusion is warranted as to the reliability of Alyfantis's proposed testimony and her qualifications to opine on the total replacement of the plumbing system. Alyfantis is not a plumber; her declaration merely states that she has experience assisting her grandfather (who is a certified plumber) with repairs and troubleshooting plumbing issues. (Alyfantis Decl. [#42-1], at ¶ 4.) This does not qualify Alyfantis to testify on the need for a total replacement of a complex plumbing system in a 16,000 square foot residence. Alyfantis's declaration states that she bases her plumbing opinions on personally observing splits and leaks in the home's copper piping, damage to ceiling and drywall, and witnessing plumbers assess the property. (*Id.* at ¶¶ 9–10.) Yet, as noted above, Plaintiffs' designated plumbing expert—Hayden (a master plumber)—testified in his deposition that he was instructed by Plaintiffs and Alyfantis to re-pipe the entire home and thought the estimate for the replacement work was "excessive." (Hayden Decl. [#33-6], at 57:6–59:2, 94:22–95:12, 160:3–15.) Plaintiffs have not identified a reliable basis for Alyfantis's opinions on the total replacement of the plumbing system or its cost.

In summary, the Court agrees with Chubb that Plaintiffs have not established that Alyfantis is qualified to testify on the need for total replacement of the plumbing and electrical systems. Additionally, her opinions are conclusory and unsupported by sufficient facts or data to ensure the Court of their reliability. The Court will therefore grant Chubb's motion as to Alyfantis and limit her testimony regrading the electrical and plumbing systems to fact testimony regarding her personal experience as Plaintiffs' general contractor, which may include soliciting bids for plumbing and electrical repairs. Alyfantis is not permitted, however, to testify as an expert as to the reasonable and necessary scope and cost of repairs to the home's plumbing and electrical systems.

### iii.   <u>**Pennington**</u>

Plaintiffs' expert designation indicates that Pennington, of Blackstone Claim Services, Inc.,  is the licensed public insurance adjuster who Plaintiffs retained to assist them with their insurance claim.  (Expert Designation [#33-1], at 1.)  Plaintiffs designated Pennington to testify regarding his inspection, analysis, estimate, and investigation into the damage to Plaintiffs' home, and assert that he intends to testify that the cost of reasonable and necessary repairs is over $7 million.  (*Id.* at 2.)  Chubb argues that Pennington should be excluded as an expert because he disclaimed any knowledge of the scope of electrical repairs in his deposition and did not perform any testing as to the plumbing system to be able to offer any reliable testimony on the need for total replacement.

Pennington has 28 years of experience as an adjuster and conducted approximately 12 to 20 inspections of Plaintiffs' property as part of his adjustment of Plaintiffs' claim.  (Pennington Dep. [#33-5], at 38:24–84:8.)  Pennington may of course testify as a fact witness, like Alyfantis, on his process as an adjuster and his personal experience working for Blackstone on Plaintiffs' claim.  However, Plaintiffs have not satisfied their burden to demonstrate by the preponderance of the evidence that Pennington would provide reliable testimony on the need for total system replacement of the plumbing and electrical systems (assuming he is qualified to do so).

Again, "an expert's testimony must be "based on sufficient facts or data.'"  *Harris*, 92 F.4th at 303 (quoting Fed. R. Evid. 702).  And an expert's proposed opinions must reflect "a reliable application" of accepted principles and methods "to the facts of the case."  Fed. R. Evid. 702(d).  Plaintiffs have not provided adequate evidence to ensure the Court of either.

First, it is not clear from a review of Pennington's deposition that he would testify to the necessity of a total replacement of the electrical system of Plaintiffs' home.  Pennington testified

in his deposition that he was not sure if the entire electrical system required replacement and that he would want extensive testing performed by an electrician to see if any of the system could be salvaged before replacing it completely. (Pennington Dep. [#33-5], at 73:4–20.) He further testified that he was "not sure" who had gone out to the home to do such testing when presented at the deposition with the bid from Lamb EJB recommending replacement or upgrading of the entire electrical system. (*Id.* at 73:4–24.) Plaintiffs have not identified sufficient facts or data to provide a foundation for any opinion by Pennington on the necessity of the proposed repairs by Plaintiffs to the electrical system in their home.

The same conclusion is warranted as to Pennington's plumbing opinions. Pennington testified in his deposition that he believes the entire copper plumbing system in Plaintiffs' home requires complete replacement. (*Id.* at 44:24–45:9.) But Pennington could not adequately identify the basis of this opinion. Pennington testified that Blackstone had talked to several plumbers who all agreed the system should be replaced because the amount of incision repairs due to the volume of leaks would create too many patches in the system and too much liability for the subcontractor. (*Id.* at 45:4–46:15.) But when pressed, he could not remember the name of any of these plumbers except for Quarter Moon Plumbing. (*Id.* at 46:12–24.) This is problematic because, as detailed below, Quarter Moon's proposal in May 2021 was for only $32,276.38 in repairs, consisting of re-piping specific identified sections of the plumbing system, not total replacement of the system. (Quarter Moon Proposal [#52-2], at 1–6.) And as already noted, Plaintiffs' designated plumbing expert (Hayden) testified that his company was merely instructed to re-pipe the home and did not conduct its own evaluation. (Hayden Decl. [#33-6], at 57:6–59:2, 94:22–95:12, 160:3–15.)

As with Alyfantis, Plaintiffs argue that Pennington conducted his own investigation of the plumbing system to support his conclusions, but Pennington's deposition testimony merely describes his visual inspection of the home and identification of areas with observed water damage.   (Pennington Dep. [#33-5], at 64:15–71:13.)   And Pennington's testimony itself illustrates the complexity of diagnosing the cause and extent of the damage of a house of Plaintiffs' size.   Pennington testified that Plaintiffs' home has 11 bathrooms and that, although he could identify damage, he did not know "specifically where all the leaks were located" and Alyfantis would be the one with that information.  (*Id.* at 70:1–8.)  Similarly, as to alleged water damage to the home's wood flooring, Pennington testified that Plaintiffs and Alyfantis had made the decision that wood flooring on the third floor needed to be replaced but did not have any information on this aspect of the repairs himself.  (*Id.* at 71:3–13.)  Plaintiffs generally cite Pennington's deposition testimony as support for their assertion that he conducted an independent evaluation of the need to replace the plumbing system, but Plaintiffs have not directed the Court to sufficient evidence that Pennington evaluated the entire plumbing system beyond making surface-level visual observations and relying on the general conclusions of other unnamed plumbing subcontractors or non-plumbers like Alyfantis.

In summary, Plaintiffs bear the burden to establish by the preponderance of the evidence that Pennington's opinions on the electrical and plumbing systems are reliable.   Insofar as Pennington intends to testify to the need to replace these systems, Plaintiffs have not identified a reliable basis for these opinions or that they are supported by reliable methods.   Therefore, as to any testimony by Pennington with regards to the electrical and plumbing systems, the Court will limit Pennington's testimony to fact testimony related to his role as public adjuster.  He may not

testify as an expert as to the reasonable and necessary scope of repairs to the plumbing and electrical systems.

**B.     Plaintiffs' Motion to Exclude**

Plaintiffs ask the Court to exclude the testimony of Mark Barsalou, Chubb's plumbing expert.   Barsalou is the majority owner of Quarter Moon Plumbing—the company that performed an inspection of Plaintiffs' plumbing system in April 2021 (two months after the storm) to make immediate repairs and assess damage.   Plaintiffs designated Barsalou as a non-retained expert.   (Expert Designation [#45-3], at 8–9.)   The designation indicates that Barsalou may offer opinion and/or inference testimony regarding (a) the physical condition of the plumbing system (at the time of inspection); and (b) the reasonable and necessary scope of work and corresponding costs to remediate and/or repair any physical damage.   (*Id.* at 9.)   Plaintiffs do not challenge Barsalou's qualifications as a master plumber.   Rather, Plaintiffs argue that Barsalou's testimony is unreliable because he was not personally involved in the inspection. Because Chubb has carried its burden to demonstrate Barsalou's proposed testimony is reliable, the Court will deny Plaintiffs' motion.

Plaintiffs' reliability challenge focuses on Barsalou's deposition testimony, in which he describes Quarter Moon's involvement in the assessment of damage to Plaintiffs' plumbing system.  Barsalou testified that Quarter Moon first became involved in April 2021, when Chubb hired the company to do an investigation, test the plumbing system, fix immediate leaks, get the water back up and running, and provide a proposal for all further plumbing repairs.   (Barsalou Dep. [#45-1], at 28:13–21, 29:16–19.)   According to Barsalou, plumbers working for Quarter Moon at that time performed approximately 40 hours of work fixing leaks and inspecting the property.   (*Id.*)   A proposal was generated, which is dated May 13, 2021, and outlines the results

14

of the plumbing investigation and repairs.  (Quarter Moon Proposal [#52-2], at 1–6.)  The work proposed was for $32,276.38 in repairs, consisting of re-piping specific identified sections of the plumbing system.  (*Id.*)

Barsalou further testified that he was not personally involved in the April 2021 investigation or the generation of the proposal.  (Barsalou Dep. [#45-1], at 19:8–17, 24:7–9.) However, he did become personally involved when Plaintiffs contacted Quarter Moon in February 2022 (approximately one year after the storm) about engaging his company to perform a complete replacement of the entire plumbing system.  (*Id.* at 86:13–18.)  Barsalou testified that the scope of work requested at this time was much more involved than what was covered in the original proposal, and his company turned down the job because it did not have the personnel capacity to do the scope of work.  (*Id.* at 26:1–4, 28:1–8, 86:13–18.)  Barsalou also testified that during the discussions with Plaintiffs in 2022, he visited the property once to convey to Plaintiffs in person that Quarter Moon was unable to do the work.  (*Id.* at 30:11–16.)  During that visit Barsalou did not inspect the entire home, only the kitchen and "maybe out the back."  (*Id.* at 30:11–16.)  When pressed as to why he did not inspect the entire home, Barsalou testified that because Quarter Moon knew it did not have the capability of doing the job, there was no need for him to look at the entire home.  (*Id.* at 30:21–23.)

Plaintiffs' reliability challenge is based on two primary assertions: (1) Barsalou was not personally involved with the April 2021 inspection and generation of the work proposal; and (2) Barsalou only visited the property one time in February 2022 and did not perform an inspection of the entire home at that time.  Neither of these arguments is a basis for excluding Mr. Barsalou from testifying at trial as a non-retained expert.  First, Barsalou, as a master plumber and the owner of Quarter Moon, has knowledge of his company's practices and records, as well as the

standards governing the plumbing industry.  "[T]here is no requirement that an expert derive his opinion from firsthand knowledge or observation."  *Deshotel v. Wal–Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted).  The reliability of Barsalou's testimony does not hinge on his personally inspecting the property, performing the work in 2021, or generating the proposal.  Given Barsalou's role as owner of Quarter Moon, he may testify on the work performed by his company in April 2021.  Additionally, given his extensive knowledge and experience handling numerous freeze-related claims in the industry, Barsalou may also provide testimony interpreting the May 2021 proposal: the processes, tests, and procedures plumbers in the industry perform to assess damage; the condition of Plaintiffs' property upon inspection; and the necessary repairs to address the storm damage.  Such testimony is not the mere parroting of the opinions of the other plumbers who performed the work; it is testimony based on his expertise in the industry and his role in the company.  Any concerns regarding Barsalou's lack of personal knowledge of the 2021 work or his failure to talk directly with the plumbers involved with that work is an issue regarding the weight given to his testimony, not its admissibility, and can be addressed through cross examination.

Moreover, the reliability of Barsalou's testimony regarding Quarter Moon's 2021 investigation and proposal is not diminished by his decision not to inspect the entire property in 2022 when Plaintiffs requested that Quarter Moon increase its scope of work (and Quarter Moon turned down the job).  Plaintiffs have not presented the Court with any cogent argument as to how the reliability of Barsalou's proposed testimony is affected by this issue.  Again, Barsalou's limited direct contact with Plaintiff's property may be explored on cross examination regarding the ultimate weight given to the testimony.

16

Finally, the Court rejects Plaintiffs' argument asserted at the hearing that the work proposal generated in May 2021 was so cursory in its content that it undermines the reliability of any testimony by Barsalou based on the report. Again, Plaintiffs do not argue that any specific methodology or test employed by any of the plumbers conducting the investigation and plumbing repairs in 2021 is unreliable, for instance because it is not accepted within the plumbing industry. Nor do they argue with any level of specifics that some aspect of the test was not performed reliably. The Court has reviewed Quarter Moon's proposal and summary, which details the various areas of the property inspected and repaired and makes specific recommendations as to which sections of plumbing require re-piping. It is not cursory, and the Court declines to strike Barsalou on that basis.

In summary, Chubb has satisfied its burden to establish that Barsalou is both qualified to testify as to Quarter Moon's work on the plumbing system in Plaintiffs' home and that any testimony he presents based on his experience in the industry and his company's records is sufficiently reliable under Rule 702. The Court will therefore deny Plaintiffs' motion.

**IT IS HEREBY ORDERED** that Defendant Chubb Lloyds Insurance Company of Texas's Motion to Exclude Expert Testimony of Nicolette Alyfantis, Garry Pennington, Gregory Hayden, and Josh Vest [#33] is **GRANTED** as follows: Alyfantis, Pennington, Hayden, and Vest are prohibited from testifying as experts as to the reasonable and necessary scope and cost of repairs to the plumbing or electrical systems of Plaintiffs' residence but are permitted to provide fact testimony regarding their personal experience as Plaintiffs' general contractor, public adjuster, and subcontractors, respectively.

**IT IS FURTHER ORDERED** that Plaintiffs' Opposed Motion to Exclude the Opinion Testimony of Mark Barsalou [#45] is **DENIED**.

17

**IT IS SO ORDERED.**

SIGNED this 11th day of March, 2024.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE